The first is Sehgal v. United States of America. Good morning. Good morning, Your Honors. My name is Florian Miedel and I represent the appellant petitioner in this case. The issue before the court this morning is fairly straightforward and limited. Should the district court have held an evidentiary hearing on petitioner's 2255 petition where there was a material dispute of fact? Is this the same district court who presided over the trial? Yes, but there was a material dispute of fact about counsel's level of representation established by the record and we know what the law is. The law says that a hearing shall be held in a 2255 case where there is a material dispute unless it is patently clear from the record that the petitioner could not prevail at a hearing. And in order for the petitioner to get a hearing, to not get a hearing, the record must conclusively show that the petitioner is entitled to no relief. So it's a relatively low burden. In fact, the petitioner need only make a plausible claim for relief. She need not establish that she necessarily would prevail to get a hearing. Here, there was a material dispute of fact as we set out in our briefs. So in light of the material factual dispute, it was error not to hold a hearing. Could you just, for my benefit, please, Mr. Mydell, identify specifically the dispute of fact that you say should have been decided after a hearing? Setting aside the issue whether trial counsel did or did not meet with the only defense witness he put on the stand, focusing specifically on the issue of whether or what the advice was about Ms. Sagal testifying, petitioner swore in her affidavit that she and counsel had virtually no conversations about that, that he failed to prepare her or advise her about it. Isn't this the attorney that she wanted after he left the firm? She specifically wanted him to represent her? Well, Your Honor, yes, but only after learning a week before the trial that that attorney had been fired by the firm that he worked for, had been replaced by two lawyers that she'd never met, had never talked to. So she's reached out also to keep him as her counsel? She did, but only by default in a sense. He was the only person, a lawyer, she'd ever spoken to. He was an associate at the law firm. He'd never tried a case, but he was the only one she'd spoken to. He's the only one who'd filed a notice of appearance. She never asked for an adjournment? She did ask for an adjournment. Did she raise the issue about that the Germans were inappropriately denied on a direct appeal in which we affirmed her conviction? I think that it was raised on a direct appeal. She lost that, so that, I mean, I understand that, but the fact that this is all in a hurry is, whether that, whether it being in a hurry is appropriate or not, is past. So the question is just the factual context of the fact that it was in a hurry. No, we're not arguing that. Or the fact that he had never tried a case before. No, we're not arguing that. Okay, well, you were saying it. I was saying it because it provides a sort of a context for his representation. I'm talking specifically about the issue of having her testify. So she had averred that in her affidavit. Trial counsel, in his affidavit, affirmed that there were lots of conversations about her testifying, that he advised her to testify during the trial, and that she told him that she would not testify categorically. But that statement by trial counsel was undermined, if not completely contradicted, by the trial record. Because at the trial, trial counsel asked specifically for time to, quote, go over her testimony with Ms. Segal. Obviously, that would have been unnecessary if she, if he had had conversations with her where she said categorically, I'm not testifying, I don't want to testify. Why would he ask for more time to discuss her testimony? Also, it would have been unnecessary for him to tell the court that she wasn't testifying because the prior two witnesses had been favorable for the defense. If his statement in his affidavit was correct, then he would have simply said, she's decided not to testify, and that's the end of it. But that obviously was undermined by the record. So unlike the cases that are cited by the government, where a defendant makes sort of a generic claim, the lawyer told, you know, ordered or told me not to testify, here we've got very specific unusual facts, and we have a situation which essentially is the opposite of those cases, where trial counsel's affidavit is undermined and contradicted by the record, not petitioner's. And that creates, clearly creates a material issue of fact. And again, the bar is very low for a hearing to be held, and a hearing should have been held in light of that. Ah, I keep coming back to the fact that the district court, who turned down the request for a hearing, also watched all of this and presided at the trial, and was familiar with both the defendant and defendant's counsel. No, there's no question, but the ineffectiveness claim that's being raised here is not something that was on the record or that would have been known by the district court as a result of presiding over the trial. So she's in no better position to adjudicate that. I know there was some problem, because she was the one that allowed this defendant to have this attorney reappointed to her, or reassigned to her. Well, she knew there was a problem in the fact that Ms. Segal's lawyers abandoned her essentially a week before the trial, but she certainly did not know what kind of conversations, if any, were had between counsel and client about the very important issue here about The only viable defense in this case was the defendant providing her insight about why she acted in the way she did. The facts were clear. She earned millions of dollars over a period of years. She didn't pay taxes on them. That's a certainly, if anything, a prima facie case. So the only issue was, what was her intent? Why would she act so contrary to her own interests and hand over millions of dollars to these other people, who then lived lavishly off of those earnings, using her as a cash cow, whereas she lived modestly over all those years? Why would she do that? That's completely against her interest. And so she needed to explain that to the jury. Otherwise, the jury was going to simply be presented with the facts. She earned money. She didn't pay taxes. That's the end of the case. But wasn't it her decision not to testify? Isn't that what you're saying to us? I'm saying that the counsel's failure was his failure to explore or advise his client that, under the circumstances, it was extremely important for her to testify. Yeah, but he was able to get before the jury that this guy was controlling. I mean, he got it in through the wife, right? He got it in through the wife partially. You're saying that it was a violation of local standards to advise a woman who was going to testify in front of a jury, that she made $5 million, was a licensed cardiologist, and that she was under the spell of someone that she met online? Well, that's the problem, right? I'm looking for 12 out there that would think that that's a reasonable defense. That's a problem. It sounds ludicrous, but it was confirmed. It was confirmed by the testimony of— No, it's not confirmed. That was her defense. No, but it was confirmed— That doesn't mean it was real. That's her defense that she's offering a jury who apparently didn't agree with—that was her defense, that she didn't agree with it. It got before the jury, didn't it? It got before the jury a tiny little bit, but it was the government's cooperating witness who essentially testified to that. Did you try cases? Of course, yeah. And your client many times exhibits an exuberance to testify. Do you advise them to not do so because you're convinced they'll—my daughter's a criminal defendant. I know. And out of the mouth of the defendant comes the necessary information to seal their fate. Of course. And in many cases, it is not— So this is a tough call. In many cases, it's not advisable. But in this case, under the circumstances, it was advisable because otherwise she had no defense at all. She either had no defense or she had some defense. And her defense was her own state of mind. The problem I'm having is I don't see how it's even some defense. May I ask you one quick question? Yes, please. At the Appendix 407-408, it recites where Attorney Kushner told the judge, look, I've had this discussion with her, et cetera. I didn't see any, but is there anywhere where the trial judge, Judge Forestine, followed up on that with a discussion with the client? I think there is, actually. After he said that, I think she asked the client, are you— Is that right? Do you agree? Is that right? And she said yes. But— Why isn't that a problem? Because that conversation took place five minutes before the defendant would have had to testify if she was going to testify. And that was the first time that there was a substantive conversation about that. That is, we have to expect more of criminal defense lawyers than to say five minutes before testimony, listen, it's going well, you shouldn't testify. Thank you. You've reserved two minutes for rebuttal? I have, yes. Good morning. May it please the Court, my name is Jason Manning and I'm representing the government on this appeal. I want to start with Judge Puglia's question about the history of the defendant Siegel's relationship with counsel. The counsel, Krishna, who represented at trial, indeed, was the counsel she had requested. It was her, really her fourth counsel. She was assigned a federal defender. She terminated the federal defender after a few months. She was then assigned a CJA attorney. She worked with that attorney. She terminated that attorney. She then hired the Blanche Law Firm in which Krishna, this associate, was working with her. After she learned that Krishna had been, had left the firm and then the Blanche Law Firm intended to represent her, she met with other attorneys from the Blanche Law Firm and then she came to Judge Forstein and wrote in a letter to the court, in two letters to the court, I want you to make efforts to have Krishna represent me at trial. And she said specifically, I want him to represent me because we communicate well and he doesn't force me into decisions. And so those pre-trial letters squarely contradict her representations in the affidavit for the 2255 that she was forced into this decision. Also... She says that up front doesn't mean it didn't occur after he started representing her and started taking more of a hand in her defense. And that's a fair point. But what was also before Judge Forstein when she was deciding the 2255 was a post-trial letter that the defendant had written after trial, after conviction, where she wrote a letter to the court and explicitly said twice in that letter I didn't testify at trial because my co-defendant, Sunil Jaitley, wouldn't allow me to and I didn't have the courage to go against him. So in that post-trial letter she again... That's the important piece, not so much what the attorney said, but that one. Sorry, not so much what she said at the front end, but what she said afterward. Yes, I would agree with that. And when we look at the record that Judge Forstein had in front of her in deciding under this court's precedence in Publisi and others to decide this 2255 without a full-blown evidentiary hearing, it's these two letters, or these three letters from the defendant that I've discussed. It's this detailed affidavit from the trial counselor, Kushner. And it's also 28 pages of e-mails that, according to Kushner's affidavit, squarely contradicts the representations in Siegel's affidavit that there were no communications between them in certain pretrial periods. So what standard do we judge Judge Funstein's decision not to have a full-blown evidentiary hearing? It's an abuse of discretion standard, Judge. It's an abuse of discretion standard. And I would submit that under Publisi she was well within her discretion to take this expanded record that included all the things I just mentioned, and also that included her own experience presiding over this trial, observing the defendant. And the most critical aspect of that experience was mid-trial, in a colloquy between the judge and the defendant, the defendant, Siegel, told her this blatant lie about her cell phone and concocted this story that I only got a cell phone for the first time last night, which was clearly shown to be a lie, and the defense counsel admitted as much. And so when you have a 2255 petition that depends in its entirety on the credibility of the petitioner Siegel's claims in her self-serving affidavit, Judge Funstein was in an excellent position to make a credibility determination there based on all of that history, including, as I said, this clear lie that she was caught in mid-trial before she was remanded. So I want to move to a different piece, which is that we've been talking about the performance prong, and defense counsel discussed the performance prong under Strickland, but there also has to be a prejudice prong. That is, there has to be some showing that Siegel could show prejudice by this decision for her not to testify, and I submit... there is no reasonable probability that had she testified there would have been a different outcome, and there's three reasons for that. One, as Judge Wesley pointed out, there was a direct appeal of this case in which the conviction was affirmed, and a panel of this court held that the jury easily concluded, based on the evidence before it, of her guilt in light of all of the revenues coming into her and the fact she didn't pay taxes. Secondly, the testimony that apparently she would have offered would have been cumulative of the testimony that both RuPaul Jaitley and her assistant, Mr. Gizes, had already put before the jury about her being under the spell of Mr. Jaitley and of her being frightened of him, et cetera. So there's no indication from the petition that anything new would have come before the jury. What is new that would have come before the jury would have been her credibility, and there's simply no reasonable probability that a jury would have found her credible. Bear in mind that in the government's case, FBI agent Minickel, 17 years' experience with the FBI, testified that he came to Dr. Siegel's office to serve a subpoena on her, and she brazenly lied to him, I'm not Dr. Siegel, a lie that was revealed as such. When she walked into the other room and the assistant told the FBI agent, yes, that's Dr. Siegel. That testimony came in in the government's case. It was not challenged on cross-examination. So this was a witness with really unique credibility problems, and I'll add to that. What do you understand that her testimony would have been had she testified that would have then been subject to some credibility analysis, like I didn't earn this money or I paid taxes on it? Well, as I understand from the defense submissions, the only defense that could have been made out through her testimony was that I somehow wasn't a willing member of this conspiracy, that I was somehow forced into it under this address. Conspiracy to pay my taxes or to avoid paying my taxes. That's right, and I submit there's no reasonable probability that a jury would have found her credible in that. What's the credibility in that? I mean, it doesn't really fit as a credibility analysis anyway. I'm not arguing with you. These are all softballs, but I'm just trying to. And I'm sure Mr. Medell can explain to me why that defense would have worked anyway. I mean, I'm not missing something, am I? No, Your Honor. That was a softball. Whether he got it right or not is another question. With that, unless the panel has any further questions, we'll rest on our reefs. Thank you. Your Honor, let me address that last question. It's sort of similar to a celebrity having a business manager or somebody who they essentially give over all of their financial business, and they rely on those people to handle them. Ms. Sigal would have been the only person who was able to testify, because there was no other testimony about this from any other witness, that one of the facets of this sort of agreement that she entered into with them was that the Jatelys would not only pay her bills, but also pay her taxes. Was the agreement in writing? No, there was no agreement in writing. When she makes the application for ineffective assistance at counsel on the necessity of her testimony, did she say, I would have testified to the fact that I understood they were paying my taxes? Honestly, I don't know if that's in the affidavit. I didn't see it, so I was kind of wondering if she'd said that. Because if she just said that they were paying bills, I don't even know how that's a defense. No, it's not. It's part of the agreement that they were taking care of all financials. In fact, she had never taken care of her own financials. Before them, her husband took care of everything. So she'd never paid bills, she'd never paid taxes, she'd never done any of that. You know, when her husband does it, there's an innocent spouse defense in regard to the obligation. The innocent spouse can get up from underneath the obligation, still be criminal, but as to whether the liens attached to it, that's a different matter. We had a case like that a few weeks ago. But I don't know that it's a defense to the criminal defense. Well, I think it is a defense in terms of her intent to enter a conspiracy to deprive the government of taxes. If she believes that those people are paying her taxes, then that's genuine and that's believed by the jury. But let me just say one more thing that counsel said, which was the prejudice prong. We're not here to decide whether her 2255 meets the Strickland standard. We're here to decide whether the court should have ordered a hearing. And that standard is less. It's not reasonable probability. It's that she has a plausible claim that she could prevail. It's still abuse of discretion. Right, but I mean, it's an abuse of discretion standard. Yes, it is. But the standard that she applied or seemingly applied was higher than she should have. Finally, in terms of the expanded record that counsel referred to, the court's decision below made clear that she didn't consider that. So it's not really part of this case at all. It would be a lot easier if we read Shell to mean must. I mean, Shell seems like must to me, but we've put a little embossing on that to say that judges can decide not to hold a hearing where it's obviously that the hearing is unnecessary, right? Right, where it's obvious. And again, it's here you do have, I think you do have an actual contradiction on the record, unlike in those other cases. Thank you very much. Thank you very much. Thank you very much. Thank you. Thank you both for reserved decision.